MURDOCK, Justice
(dissenting).
Like Justice Lyons, I simply am unable to reconcile the construction of the asset-purchase agreement successfully urged upon this Court by the defendants, Alabama Dynamics, Inc., and Gene Ernest, with the plain language of the agreement itself. Even if that construction could be considered a reasonable one, however, that would simply mean that the asset-purchase agreement is susceptible of two reasonable constructions. If this is so, this Court should consider the fact that there is ample parol evidence that would make a summary judgment in favor of the defendants inappropriate, including, for example, testimony that the parties did not intend to require a June 2002 closing and evidence of a course of dealing before and after June 30 (including the post-June 30 letters quoted at length in the main opinion) at odds with the notion that June 30, 2002, was the deadline for closing the transaction.[6]
I write primarily, however, to address the language of the asset-purchase agreement itself and, based on that language, what I consider to be the reasonableness of the plaintiffs’ construction of the contract and the irrationality of the defendants’ construction.
As a preliminary matter, I note the main opinion’s characterization of the plaintiffs’ argument as being that § 1(c) of the asset-purchase agreement “necessitates a closing date after June 30, 2002.” 20 So.3d at 791 (emphasis added). The essence of the plaintiffs’ argument, however, is not that the contract required a closing after June 30, but that it did not require a closing before June 30. It is the plaintiffs’ position that the trial court erred in holding that the contract did not contemplate the possibility of a closing after June 30. This position is consistent with § 1(c), which provides for an adjustment of the purchase price at closing for “any” changes to the assets and liabilities after June 30. See also Plaintiffs’ brief on appeal, at pp. 49-50 (arguing that the plaintiffs “have shown the existence of a genuine issue[ ] of material fact that the Agreement did not have a closing [deadline] of June 30, 2002”), p. 56 (stating that the mechanism described in § 1(c) “clearly contemplates a closing after June 30, 2002”), and p. 61 (arguing that “[t]he circuit court’s finding that the only reasonable interpretation is the Agreement requires a closing in June, 2002, must be reversed”).

A. Section 2(a) of the Asset-Purchase Agreement

That said, I turn to the language found in § 2(a) of the asset-purchase agreement stating that the sale “shall be closed on June_, 2002.” At least in the context of *795 the other contractual provisions at issue, I submit that the fact that the parties left this date blank indicates that there was no final meeting of the minds as to what the closing date should be. A date left blank in a contract is hardly a persuasive indication, or manifestation, of mutual assent as to a date by which a closing had to occur.
To reach its conclusion to the contrary, the main opinion depends on the language in § 12(f) that “time is of the essence.” The main opinion reasons:
“Given that the asset-purchase agreement called for a closing ‘to occur on June _, 2002,’ and that it stated that ‘[t]ime is of the essence of this Agreement,’ we conclude that the intent of the parties was for the purchase to close no later than June 30, 2002.”
20 So.3d at 792.
I believe this reasoning asks too much of the boiler-plate language of § 12(f). The fact remains that the parties left blank the provision in the agreement calling for a closing date. The main opinion reasons, however, that the time-is-of-the-essence clause gives meaning to the closing-date provision, requiring us to fill in the blank in that provision. I suggest the converse: The absence of an agreed-upon closing date serves to deprive the time-is-of-the-essence clause of meaning. In short, there is no date onto which the time-is-of-the-essence clause can latch itself.
This inefficacy of the time-is-of-the-essence clause in the context of this particular agreement is all the more likely in light of all the other dates in the asset-purchase agreement that also were left blank. These include the date on which the agreement was entered into, the date by which the agreement must be “accepted,” and the date the agreement was signed by the various parties.
Finally, I submit that the plaintiffs’ construction of § 2(a) is more reasonable still when considered in conjunction with the provisions of § 1(c), to which I now turn.
B. Section 1(c) of the Asset-Purchase Agreement
Section 1(c) of the asset-purchase agreement states:
“Seller and Purchaser shall jointly perform an examination of Seller[]s balance sheet as of the Date of Closing and the Purchase Price shall be adjusted to reflect any changes therein since June 30, 2002. Any increase or decrease in total assets, excluding plant and equipment, and total liabilities shall be reflected by an identical change in the total purchase price and the amount of cash due at closing. All items are to be accounted for in accordance with Generally Accepted Accounting Principles (GAAP), consistently applied.”
(Emphasis added.)
Unlike § 2(a), this section (particularly the emphasized passages) contains no incomplete blanks and, therefore, reflects no incomplete thoughts. It therefore is much easier to conclude that § 1(c), unlike § 2(a), reflects a final meeting of the minds of the parties as to its subject matter. Nonetheless, the plaintiffs and the defendants urge upon this Court two different meanings of § 1(c). I have been able to make sense of only one of these.
The first possible meaning, and the one that makes sense to me, is this: Having agreed on a purchase price that would be good through June 30, the parties simply provided in § 1(c) for the purchase price to be adjusted if the closing did not occur until after that date. Specifically, § 1(c) means that if the closing occurs after June 30, 2002, the parties will, at that closing, examine the balance sheet reflecting the assets and liabilities of the business as of *796 that closing date and adjust the purchase price to be paid at that closing to reflect any changes in the assets and in certain liabilities of the business occurring between June 30 and that closing date. (“[T]he Purchase Price shall be adjusted to reflect any changes ... since June 30.”) Under this reading, the phrase “examination of Seller[’]s balance sheet as of the Date of Closing” refers both to the effective date of the balance sheet and the date on which the examination of it is to be conducted. Furthermore, the provision for an adjustment of “the amount of cash due at dosing” makes sense if, but only if, it is based on an examination of a balance sheet that is actually conducted at the time of the closing, rather than on some date after the closing.
This is a reading of § 1(c) that is simple and straightforward. It is a plain reading of the language used in the asset-purchase agreement, see State ex rel. Riley v. Lorillard Tobacco Co., 1 So.3d 1, 7 (Ala.2008) (“When a court construes a contract, the clear and plain meaning of the terms of the contract are to be given effect, and the parties ax*e presumed to have intended what the terms clearly state.” (citations and internal quotation marks omitted)), and one that does not suffer from the inconsistencies and irrationalities of the alternative construction urged by the defendants. In addition, this reading contemplates a procedure for making adjustments to the purchase price at the closing in a way that is common to transactions of this nature.
The second possible meaning of § 1(c), and the one adopted by the majority, is the one of which, try as I might, I have not been able to make sense. Specifically, according to the defendants, § 1(c) should be read in light of the defendants’ interpretation of § 2(a) — that the closing must occur no later than June 30, 2002 — as a provision requiring a “true up” of the purchase price to occur at some time after June 30, 2002. Apparently, under this reading, the “true up” of the purchase price would utilize a balance sheet that reflects assets and liabilities “as of the Date of Closing” (no other balance sheet is referenced) and then would have the parties make an adjustment to the purchase price to reflect changes to the assets and liabilities occurring “since June 30, 2002” i.e., between June 30 and the date of the true up. Under this interpretation, the phrase “examination of Seller[’]s balance sheet as of the Date of Closing” can be a reference only to the date of the balance sheet, not to the date on which the true-up examination of the balance sheet is to be conducted, since by definition under this interpretation the true up is to be conducted some time after the closing.
Unlike the first possible construction discussed above, this interpretation of § 1(c) is not straightforward and does not reflect a plain reading of the language of the asset-purchase agreement. It suffers from the following gaps and irrationalities in its structure and application:
1. The defendants argue that the reference in § 2(a) to a closing “on June _, 2002,” means that the parties intended that the closing must occur “some time in June, 2002” or, in other words, on or before June 30, 2002. Unlike the more straightforward interpretation of § 1(c) discussed above, which would entail an adjustment only at a post-June 30 closing for “any changes ... since June 30,” the defendants’ interpretation of § 1(c) contemplates a “true up” of the purchase price after a closing that, by the defendants’ own interpretation, could occur before June 30. Thus, the defendants’ construction of the asset-purchase agreement requires an adjustment to the purchase price to reflect changes that could occur between June 30 *797 and the date of the “true up,” while ignoring the changes that could occur between the closing date and June 30 (a period that could be up to 29 days long and possibly longer than the time between June 30 and the subsequent date on which the “true up” is conducted).
2. If, as interpreted by the defendants, the agreement requires a closing on or before June 30, 2002, why provide for any post-closing, post-June-30 adjustment to the purchase price? Why not just plan to look at the balance sheet as of the date of closing and make whatever adjustments are needed at that time? There is nothing in the asset-purchase agreement itself or in the facts pertaining to the nature of the business or the making of the agreement that suggests any anticipated post-closing or post-June-30 development or event that would warrant a reopening of the transaction and a changing of the purchase price after what was, after all, supposed to be a “closing” of the transaction.
3. The asset-purchase agreement is completely silent as to when the true-up examination is to occur. Is it to occur within 30 days after the closing? Within three months? Why not after the purchaser has a full year’s experience operating the business? We are not told. The time for this “true up” is left unaddressed and undefined. This despite the fact that time, according to § 12(f) of the agreement, “is of the essence.” Nor is there any anticipated external event or development that would suggest when the true up is to occur. See point 2, above.
Presumably, the longer the wait to this indefinite true-up date, the greater the potential change in the purchase price. Although commercial transactions can and do sometimes contemplate certain post-closing adjustments to the obligations of the parties, they typically do so in a much more defined manner than this. We have here, according to the defendants, an agreement that sets a specific purchase price for specific assets and provides for an “of the essence” timing for the closing of not later than June 30, yet also provides that, for no known reason, the parties are, at some indefinite date in the future, to reconvene and recompute the purchase price for those assets based on whatever developments may have occurred in the life of the business since the so-called “closing.”
4.When one attempts to apply the language in § 1(c) in the manner urged by the defendants, as requiring a true up after any closing, it becomes potentially unworkable. As interpreted by the defendants, § 1(c) is a true-up provision that requires an adjustment of the purchase price after the closing has occurred. Specifically, it would require the seller and the purchaser to “perform an examination of Seller[’]s balance sheet” and adjust the purchase “to reflect any changes therein since June SO, 2002.” The problem is that § 1(c) specifically requires that the balance sheet to be examined for purposes of this adjustment be the “Seller[’]s balance sheet as of Date of Closing.” Thus, under the defendants interpretation of §§ 1(c) and 2(a) of the agreement, for any closing occurring before June 30, the parties supposedly are required to perform the mathematically nonsensical task of computing the difference in the value of the assets and liabilities on the true-up date and the value of the assets and liabilities on June 30 by computing the difference in the value of the assets and liabilities on the true-up date and the value of the assets and liabilities on some date before June 30. This is the equivalent of asking someone to compute the difference between “A” and “C” by computing the difference between “A” and “B,” when “B” and “C” are not necessarily equal.
*798 5. How can one adjust “the amount of the cash due at closing,” as expressly required by § 1(c), if, as the defendants argue, the adjustment to be conducted pursuant to that section is a “true up” that is to be conducted some number of days (or perhaps weeks or months) after the dosing?
C. Conclusion
Based on the foregoing, the only way I can make sense of the asset-purchase agreement is as an agreement that does not set a specific closing date but does allow for the possibility of a closing after June 30, 2002. Without an agreed-upon closing date, the agreement should be read to require a closing within a “reasonable time.” See Smith v. Pope, 280 Ala. 662, 666, 197 So.2d 767, 770 (1967). The question therefore becomes whether the August 23 deadline for closing set by the defendants was reasonable. I would reverse the judgment of the trial court and remand this cause for further proceedings to consider this question. Therefore, I dissent.

. The appellants, the plaintiffs below — Kel-mor, LLC, James S. Pace, and Melvin Zimmerman — also argue that the record contains evidence indicating that the defendants’ lawyers drafted the asset-purchase agreement and that any ambiguity in the agreement therefore should be construed against the defendants. See, e.g., SouthTrust Bank v. Copeland One, L.L.C., 886 So.2d 38, 43 (Ala.2003) C'[A]ny ambiguity in a contract must be construed against the drafter of the contract.”).